***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and arguments of the parties. The appealing party has shown good grounds to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of Deputy Commissioner Donovan and enters the following Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. At the time of the injury that gives rise to this claim, the parties were subject to *Page 2 
and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At such time, an employment relationship existed between Plaintiff and Defendant-Employer.
3. The Hartford was the carrier on the risk for Defendant-Employer.
4. Plaintiff's claim for an November 21, 1999 incident was accepted as compensable by Defendants on an Industrial Commission Form 60.
5. Plaintiff's applicable average weekly wage is $498.75.
6. Plaintiff has been receiving ongoing temporary total disability benefits at a compensation rate of $332.52 since the Full Commission's November 19, 2003 Opinion Award.
7. Plaintiff filed Form 33 on November 16, 2005 claiming that she is entitled to a determination that she is permanently and totally disabled pursuant to N.C. Gen. Stat. § 97-29 and that she is experiencing increased pain and discomfort due to the injury to the right thumb, neck, and back and resulting psychological issues resulting in a change in condition pursuant to N.C. Gen. Stat. § 97-47. Therefore, Plaintiff claims that she is also entitled to additional future medical compensation pursuant to N.C. Gen. Stat. § 97-25.1 and North Carolina Industrial Commission Rule 408.
8. Defendants filed a Form 33R in response to Plaintiff's Form 33 on December 12, 2005.
9. Plaintiff also filed a Form 18M on November 16, 2005. Defendants responded to Plaintiff's Form 18M on or about December 12, 2005 and filed a supplemental response dated December 15, 2005. Plaintiff's Form 18M was denied by the Commission on January 24, 2006.
10. Documents stipulated into evidence included the following: *Page 3 
 a. The parties' Pre-Trial Agreement;
 b. Stipulated Exhibit 1, consisting of medical records, NCIC filings, and correspondence;
 c. Stipulate Exhibit 2, consisting of a surveillance video;
 d. Stipulated Exhibit 3, consisting of a surveillance video;
 e. Full evidentiary record of July 29, 2002 hearing before Deputy Chrystal Redding Stanback and March 17, 2003 hearing before Full Commission.
11. The depositions of Dr. Albert K. Bartko, Dr. Christopher Edwards, Dr. Veerainder Goli, Dr. Mark Phillips, Dr. Heather Fullerton, Dr. Ann Neulicht are a part of the evidentiary record in this case, as are the exhibits to the transcripts of those depositions.
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. The Full Commission's November 19, 2003 Full Commission Opinion and Award is incorporated by reference as if fully set forth herein, from which neither party appealed.
2. In the November 19, 2003 Opinion and Award, the Full Commission concluded that Plaintiff reached maximum medical improvement for her neck and back conditions no later than June 20, 2002 and that she is not entitled to further medical treatment for these conditions based on incredible, unsubstantiated, ongoing pain complaints. The Full Commission also found that Plaintiff had not yet reached maximum medical improvement for her compensable right thumb condition which may require thumb surgery. Defendants were entitled to designate an *Page 4 
appropriate treating physician to direct Plaintiff's right thumb treatment. Plaintiff was found to be capable of participating in vocational rehabilitation efforts provided by Defendants while receiving ongoing temporary total disability compensation for her right thumb condition. Plaintiff was entitled to receive all past medical treatment received for her compensable neck, back, and right thumb injuries that was necessary to effect a cure, give relief, or lessen plaintiff's period of disability including reasonable acupuncture treatment received from Dr. Bloom for the period from November 8, 2000 through February 7, 2001 to be paid at the rate of $60.00 per visit. The Full Commission further concluded that Plaintiff is entitled to future medical treatment for her compensable right thumb condition only to be provided by Defendants as may be reasonably necessary to effect a cure, give relief, or lessen plaintiff's period of disability.
3. In the November 19, 2003 Opinion and Award, the Full Commission ordered Defendants to continue paying Plaintiff temporary total disability benefits at the rate of $332.52 per week so long as plaintiff's period of disability regarding her right thumb continues or until further Order of the Industrial Commission. Defendants were also ordered to pay all future medical expenses directed by the newly designated treating physician incurred by Plaintiff as a result of her compensable right thumb injury that is reasonably designed to effect a cure, give relief, or lessen plaintiff's period of disability. Plaintiff was also ordered to participate in vocational rehabilitation provided by Defendants.
4. At the hearing before the Deputy Commissioner, Plaintiff admitted that she disagrees with that November 19, 2003 Full Commission Opinion and Award and that her disagreement with the Commission's 11/19/03 Opinion Award is the reason she requested the October 28, 2008 hearing. Plaintiff further alleged that she has been having pain throughout her entire body and that she reported diffuse pain throughout her body to the doctors she has seen *Page 5 
since the November 21, 1999 incident and that she has not stopped reporting that pain throughout her body.
5. Plaintiff testified that her 86 year-old mother had moved into her house and that Plaintiff was assisting her mother with medical issues. Plaintiff continues to run errands for herself and to volunteer at the garden project at her church.
6. Plaintiff testified that she is "losing her mind with pain" and "going insane with pain." Plaintiff testified that her pain, which Plaintiff relates to the original November 21, 1999 incident, permeates her entire body including her eyes and that the pain often keeps Plaintiff from leaving her house. Plaintiff testified that her pain is so severe and so continuous that she can never clean her own house. Plaintiff testified that her right thumb felt like "someone hit it with a hammer" on the day of hearing before the Deputy Commissioner.
7. At the July 29, 2002 hearing before the Deputy Commissioner, Plaintiff testified that she would experience so much pain related to her compensable injury that she would have to "roll [her]self off the bed" onto a pile of pillows to get to the bathroom. Plaintiff further testified that, as of October 17, 2000, "the pain in [her] neck and [her] back and [her] thumb had just overtaken [her]." Plaintiff testified that her pain had "migrated" all over her body, such that the only part of her that did not hurt when she was originally examined by Dr. Bartko was her feet, that "there's never a day without pain anymore," and that there were no periods of time when Plaintiff was pain free between the compensable November 21, 1999 fall and the July 29, 2002 hearing. Plaintiff further testified that she did not use her right thumb and had to use her index and middle fingers to open her car door and turn the key to her car in the ignition, and that she would experience so much pain without acupuncture that she could not turn her neck to back out of a parking space and had to lie down in a pew to attend church. *Page 6 
8. Defendants conducted surveillance of Plaintiff on September 19, 2008, September 20, 2008, October 1, 2008, October 4, 2008, and October 11, 2008. The 2008 video surveillance demonstrates that Plaintiff's portrayal of her physical and psychological condition to her physicians, the Commission, and Defendants is not accurate.
9. The Full Commission finds based upon the greater weight of the competent evidence that Plaintiff's complaints of pain and other symptoms, both physical and psychological, to her healthcare providers, the Commission, and Defendants, are not accurate or credible and are given little weight.
10. Plaintiff has seen more than thirty physicians in the course of this claim, many of them of her own choosing and often without prior authorization by or notice to Defendants. Plaintiff continued improperly choosing her own physicians even after the Full Commission's November 19, 2003 Opinion and Award ordered that Plaintiff's medical care be directed by Defendants.
11. Plaintiff sought treatment with Dr. Gary Poehling on January 12, 2004 and with Dr. Michael Norins on January 28, 2004 without prior approval from Defendants. Both physicians diagnosed Plaintiff with complex regional pain syndrome ("CRPS"), but both physicians' diagnoses were based on Plaintiff's complaints of widespread pain not limited to her right thumb. The Commission finds that Dr. Norins' and Dr. Poehling's opinions are based on Plaintiff's pain complaints, which are found not to be credible.
12. On March 19, 2004, Plaintiff was seen at the Carolina Hand Center by Dr. Steven Sanford who released Plaintiff with a 15% permanent partial disability rating to her right hand, noted that no further surgery would benefit Plaintiff, and recommended Plaintiff avoid repetitive pinching and grasping with her right thumb. *Page 7 
13. On May 18, 2004, without prior authorization, Plaintiff saw Dr. Mark Phillips at Guilford Pain Management on referral from Dr. Marcus Duda, whose opinions the Full Commission found not to be credible in the November 19, 2003 Opinion Award. Plaintiff's chief complaint to Dr. Phillips on that occasion was Complex Regional Pain Syndrome, and Plaintiff brought "a large folder with various internet synopses on complex regional pain" to the May 18, 2004 appointment. Plaintiff complained to Dr. Phillips "of overall pain which is independent of her right thumb pain," and Dr. Phillips noted that Plaintiff "was not focused primarily on her thumb but on her global pain." Dr. Phillips' note states, "[S]he seemed to display some pain displays but throughout the exam, she had excellent flexibility of her joints without any apparent pain," and "[A]t one point, she became very histrionic and suddenly fell back on the exam table as if fainting." Dr. Phillips noted that Plaintiff had "questionable fibromyalgia," diagnosed Plaintiff with "a diffuse pain syndrome of questionable etiology," and opined that Plaintiff does not have CRPS. Dr. Phillips referred Plaintiff to Dr. Veeraindar Goli at Duke University Medical Center.
14. Plaintiff was not seen by any other physician between her May 18, 2004 examination by Dr. Phillips and February 15, 2006 when she was first seen by Dr. Goli at Duke. Although Plaintiff has alleged that Defendants failed to authorize Plaintiff's medical examination and treatment during this period, the evidence shows that Defendants tried to direct Plaintiff to several physicians after May 18, 2004 and that Defendants authorized treatment with Dr. Goli on January 12, 2005. The parties had a difficult time contacting Dr. Goli or his office to schedule an appointment for Plaintiff until November 4, 2005.
15. Plaintiff was first examined at Duke University Medical Center by Dr. Goli's partner, Dr. Christopher Edwards, on March 1, 2006. On that occasion, Plaintiff told Dr. *Page 8 
Edwards that, while she also experiences pain in her right hand, hips, and legs, she experiences her "most significant pain . . . in her back." Plaintiff told Dr. Edwards her back pain "radiate[s] up and down her spine" and described it "as being electrocuted" and reaching a "10+/10" level.
16. Plaintiff has continued to treat with Dr. Goli and Dr. Edwards since March 1, 2006, for which Defendants pay for her appointments and for Plaintiff's transportation from her home in Greensboro to those appointments in Durham.
17. Plaintiff's treatment at Duke University Medical Center has consisted largely of Plaintiff's subjective reports of her alleged symptoms, acupuncture, biofeedback, and counseling and therapy sessions in which Plaintiff voices subjective complaints including her alleged pain and alleged mistreatment by Defendants.
18. On August 18, 2008, Plaintiff told Dr. Goli that she "has primarily pain located in the back radiating down to the left leg and knee [that] . . . has been worse ever since she discontinued aquatic therapy." Plaintiff also told Dr. Goli that her pain is made worse by any kind of stress and increased physical activity. Plaintiff agreed at the hearing before the Deputy Commissioner that the aquatic therapy which she had reported to Dr. Goli decreased her pain requires increased physical activity, which Plaintiff reported to Dr. Goli increases her pain.
19. Dr. Albert K. Bartko, III, is an expert in physical medicine and rehabilitation who was practicing with Guilford Orthopedic in Greensboro, North Carolina, when he saw Plaintiff. During his June 10, 2002 examination of Plaintiff, Plaintiff told Dr. Bartko that she was experiencing pain not just in her right thumb but throughout "almost her entire body except for the ankle and foot on both sides" and "that weather may very well be the most significant factor and exacerbation of pain and worse on days when the barometric pressure is low." Plaintiff also reported to Dr. Bartko on June 10, 2002 that she sometimes had to lie down on the floor of her *Page 9 
church to lessen her pain. Plaintiff told Dr. Bartko on June 10, 2002 that she needed acupuncture to live.
20. As of June 10, 2002, Plaintiff had already been diagnosed with fibromyalgia, Dr. Duda had recommended aquatic therapy for Plaintiff, and Plaintiff had undergone massage therapy and biofeedback on Dr. Duda's recommendation. Dr. Bartko actually suggested the possibility of a multi-disciplinary pain clinic for treatment of Plaintiff's symptoms in 2002, because Dr. Bartko "was worried about possibly other factors impacting her perception of pain."
21. After Dr. Bartko saw the surveillance video from 2001 and 2002, Dr. Bartko opined that Plaintiff did not need any further medical treatment whatsoever, including psychological input, or multi-disciplinary pain care. Dr. Bartko further opined after having reviewed Plaintiff's surveillance that Plaintiff could return to work doing what she was doing before.
22. Dr. Bartko testified that multiple facets of the 2001 and 2002 surveillance he reviewed changed his opinion with regard to Plaintiff's level of pain and disability, including Plaintiff's opening her car door with her right hand, Plaintiff's walking with a "normal fast-paced gait," holding her cell phone to her ear with her right arm while walking and talking, using her right hand to manipulate her keys in the car door, carrying a purse over her right shoulder and then across her right forearm, using her hand and arm for gesturing in conversation, opening a door to her house with her right hand, carrying items, bending forward, cleaning her car with repetitive motions of both hands, generally manipulating items with her right hand, shutting car doors with her right hand, repetitive bending at the waist, twisting and bending, opening the hatch of her car with her right hand, manipulating and opening an envelope with her right hand, and swinging her arm normally with her gait. Dr. Bartko testified that Plaintiff's arm swing was *Page 10 
of note because, "if somebody is really experiencing a lot of pain in their arm, they'll often assume a guarded position where they hold it close and they don't want to use it or swing it, for example." Dr. Bartko also noted that Plaintiff did not make any outward expressions of pain on the surveillance video in 2002. Dr. Bartko testified that Plaintiff's presentation to him on June 10, 2002, before he had reviewed any surveillance video, would have lead him to expect that he would see expressions of pain on Plaintiff's face performing the activities that the surveillance video depicted Plaintiff performing, because Plaintiff had reported having to lie down in the back of her church due to her pain.
23. In preparation for his December 22, 2008 deposition, Dr. Albert Bartko reviewed all of Plaintiff's available medical records. Dr. Bartko testified that his review of the medical records from Dr. Goli and Dr. Edwards at Duke University Medical Center indicate the Plaintiff is basically receiving the multi-disciplinary pain care that he had recommended before he saw Plaintiff's surveillance video in 2002. Dr. Bartko opined that his review of the medical records from Plaintiff's treatment with Dr. Goli and Dr. Edwards indicate that the treatment has not improved Plaintiff's symptoms. Dr. Bartko opined that the fact that modalities including biofeedback and massage are not lessening Plaintiff's pain over time causes him to wonder "what other factors might be impacting on that," including "adversity regarding return to work, psychosocial factors, untreated depression, anxiety . . . secondary gain."
24. During his December 22, 2008 deposition, Dr. Bartko reviewed the 2008 surveillance video of Plaintiff. Dr. Bartko testified that the 2008 surveillance video demonstrates Plaintiff lighting a cigarette with her right hand, driving and steering her car with her right hand, holding a coffee cup by its handle and drinking out of it with her right hand, unlocking her car with her keys in her right hand, taking money out of an ATM and holding the money with two *Page 11 
hands, getting in and out of her car and opening her car door with her right hand on all occasions, bending down to inspect her car or something near her car, walking without difficulty and swinging her right arm away from her body, reaching in and out of her car while bending at the waist, grabbing bags of groceries and dry goods with her right hand, closing the trunk of her car with her right hand, reaching into her pocket with her right hand, stooping over to the ground, all without any outward displays of pain or discomfort. Dr. Bartko testified that, although he would have expected to see Plaintiff having problems with all of the activities she undertakes on the 2008 surveillance video based on her reports of pain and other symptoms recorded in the Duke medical records he had reviewed, Plaintiff did not appear to have any difficulty with any of the activities.
25. Dr. Bartko testified that the 2008 surveillance video demonstrates that Plaintiff is "about as functional as" Plaintiff was in the surveillance video from 2002 and that he did not see any substantial change in Plaintiff's functional ability between the video taken in 2002 and the video taken in 2008. Dr. Bartko further testified that Plaintiff's functional ability as demonstrated on the 2008 surveillance video is inconsistent with Plaintiff's subjective reports about her symptoms to her healthcare providers at Duke.
26. Dr. Bartko further testified that it is not possible to reasonably explain the difference in Plaintiff's clinical presentation to him and the physicians at Duke and her functional capacity as demonstrated on the surveillance video in terms of "good days" versus "bad days."
27. Dr. Bartko testified that Plaintiff is presenting to her treating physicians with pain and other symptoms for purposes of secondary gain in the form of workers' compensation benefits. *Page 12 
28. The Full Commission finds Dr. Bartko's opinions and testimony credible and competent, as they are based not on Plaintiff's subjective allegations but on a thorough review of all of Plaintiff's available medical records, a physical examination, and consideration of video surveillance evidence.
29. Dr. Bartko's reports, testimony, and opinions demonstrate that Plaintiff is able to work despite her compensable injuries.
30. Dr. Veeraindar Goli is an expert in psychology, anesthesiology, and pain management who was practicing with Duke University Medical Center when he saw Plaintiff. Dr. Goli has based his medical opinions and recommendations on what Plaintiff tells him about her symptoms and on his review of Plaintiff's medical records, including the discredited records of Dr. Duda and Dr. Bloom. Dr. Goli's medical notes comprise what Plaintiff subjectively reports about her symptoms. Dr. Goli testified that he does not have any choice but to believe what Plaintiff tells him about her subjective complaints. Dr. Goli testified that he is sure that Plaintiff is telling him the truth about her symptoms because Plaintiff is consistent in her report about her symptoms, even though Dr. Goli himself wrote in a September 20, 2006 letter, "We hesitate to recommend any part-time or light duty work given theinconsistency of [Plaintiff's] symptoms." Dr. Goli also testified that he would not know "[i]f Plaintiff intentionally really put up an act" regarding her pain and other symptoms. Dr. Goli has not performed any objective diagnostic studies on Plaintiff during the course of her treatment with him because, in his opinion, it would "be a waste of time and money." Dr. Goli testified that the only "objective" part of his assessment of Plaintiff is placing Plaintiff's subjective complaints on an objective scale, like a scale of one to ten. *Page 13 
31. Plaintiff tells Dr. Goli that her pain occurs in different parts of her body on different occasions. Dr. Goli does not have an opinion as to whether Plaintiff's current back and/or leg pain is related to her right thumb pain. Dr. Goli testified that he has not diagnosed Plaintiff with CRPS or RSD but only with chronic pain syndrome. Dr. Goli admitted that he believes Plaintiff's current chronic pain syndrome is the result of Plaintiff's November 21, 1999 fall, and Dr. Goli testified that there has been no substantial change in Plaintiff's condition since November 21, 1999.
32. On June 14, 2006, Plaintiff told Dr. Goli that she is not able to go back to work, and Dr. Goli has restricted her from work because of Plaintiff's reports of pain. Dr. Goli testified that he will continue treating Plaintiff as long as Plaintiff continues telling Dr. Goli she has pain.
29. Dr. Goli testified that Plaintiff's bipolar disorder, which includes depression, is not the result of the injury that gives rise to this claim. Dr. Goli admitted that Plaintiff's Attention Deficit Disorder (ADD) does not have anything to do with the injury that gives rise to this claim. Dr. Goli testified that it would be "hard to say one way or the other" whether Plaintiff's alleged pain exacerbated the hypermania with which Dr. Goli diagnosed Plaintiff.
33. Dr. Goli has never seen any surveillance video of Plaintiff or read the Industrial Commission's November 19, 2003 Opinion and Award. Dr. Goli testified that he would treat Plaintiff the same regardless of the Industrial Commission's November 19, 2003 Opinion and Award.
34. The Full Commission finds Dr. Goli's opinions are based on Plaintiff's subjective complaints, which are found not to be credible.
35. Dr. Christopher Edwards, an expert in clinical psychology and psycho-neuro endocrinology, was the Director of the Chronic Pain Management Program, Biofeedback Lab *Page 14 
and Pediatric Neuro-psychology Lab at Duke University Medical Center when he saw Plaintiff. Dr. Edwards testified that the primary reason for the treatment Plaintiff is receiving at Duke is Plaintiff's alleged pain. Dr. Edwards testified that there are no measures beyond subjectivity that capture and characterize the experience of pain and that, with regard to measuring a patient's pain, the state of the technology is self-report. When asked what objective findings he has about Plaintiff and her symptomology, Dr. Edwards listed: (a) psychometric testing, which he admitted functions on the basis Plaintiff's self-report; (b) Plaintiff's medical records; (c) Plaintiff's referral by Dr. Goli; (d) Dr. Edwards' "ongoing context and conversations" with Dr. Goli; and (e) Plaintiff's clinical interview. All of these are based upon Plaintiff's subjective complaints, which the Full Commission finds not credible and contrary to the greater weight of the evidence.
36. Dr. Edwards testified that Plaintiff's major depressive disorder and attention deficit disorder pre-existed the November 21, 1999 injury that gives rise to this claim. Dr. Edwards agreed that Plaintiff would still have personality disorders without her alleged pain and that Plaintiff's personality disorders would still be treatable with the modalities offered to her at Duke regardless of her pain. Dr. Edwards agreed that Plaintiff's depression and anxiety could have been impacted by circumstances other than Plaintiff's alleged pain which have nothing to do with Plaintiff's compensable injuries, including the death of Plaintiff's father, Plaintiff's divorce, and the death of Plaintiff's prior spouse, all of which have taken place immediately preceding or after the November 21, 1999 incident that gives rise to this claim. Dr. Edwards further agreed that Plaintiff could have a major depressive disorder and anxiety independent of her alleged pain and that Plaintiff's major depressive disorder and anxiety could have been exacerbated by factors unrelated to Plaintiff's compensable injuries. Dr. Edwards agreed that *Page 15 
Plaintiff's pain is considered a source or exacerbator of Plaintiff's psychological conditions because Plaintiff continues to allege pain.
37. Dr. Edwards testified that he cannot opine as to any change that has occurred since November 2003, in the nature of Plaintiff's major depressive disorder, pain disorder, attention deficit disorder, CRPS, fibromyalgia, or any other injury, disease, or condition with which Plaintiff has been diagnosed.
38. Although Dr. Edwards' medical notes and testimony indicate that Dr. Edwards ruled out a diagnosis of "histrionic personality disorder" for Plaintiff, Dr. Edwards nonetheless testified that he has diagnosed Plaintiff with histrionic personality disorder because Plaintiff meets the criteria for that diagnosis.
39. Dr. Edwards agreed that malingering is defined by the Diagnostic Statistical Manual IV and that how Plaintiff acts when she does not know she is being observed would qualify as an objective finding for purposes of diagnosing malingering.
40. The Full Commission finds that the surveillance video introduced by Defendants demonstrates that there is a marked discrepancy between Plaintiff's claimed disability and stress and the objective findings, specifically the surveillance video.
41. The Full Commission finds Dr. Edwards' opinions to be based upon Plaintiff's subjective complaints, which the Full Commission finds not credible and contrary to the greater weight of the evidence.
42. Dr. Heather Fullerton is an expert in physical medicine and rehabilitation who was practicing with Regional Physicians Physical Medicine Rehabilitation in High Point, North Carolina, when she saw Plaintiff. Dr. Fullerton opined that Plaintiff does not have CRPS and that Plaintiff was carrying a diagnosis of CRPS because Dr. Duda had diagnosed Plaintiff *Page 16 
with CRPS. Dr. Fullerton agreed that she did not have any choice but to rely on what Plaintiff told her about Plaintiff's symptoms in diagnosing Plaintiff with chronic pain syndrome and making recommendations in accordance with that diagnosis.
43. Plaintiff reported diffuse pain throughout her entire body to Dr. Fullerton. However, on physical examination, Plaintiff had full range of motion in all body parts and did not complain of pain with palpation to any body part, including her right upper extremity. Dr. Fullerton recommended acupuncture for Plaintiff because Plaintiff told Dr. Fullerton that acupuncture helps Plaintiff's alleged pain.
44. Dr. Fullerton further recommended psychiatric treatment for Plaintiff because Plaintiff's complaints of widespread pain are suggestive of having some psychological issues and pain behavior responses to the injury that she had.
45. The Full Commission finds Dr. Fullerton's opinions to be based upon Plaintiff's subjective complaints, which the Full Commission finds not credible and contrary to the greater weight of the evidence.
46. Dr. Mark Phillips is an expert in pain medicine and anesthesiology who was practicing with Guilford Pain Management in Greensboro, North Carolina, when he saw Plaintiff on May 18, 2004. Dr. Phillips opined that Plaintiff's pain which Plaintiff alleged was afflicting all parts of her body was separate from Plaintiff's right thumb pain and was a different type of pain than that in her right thumb. Dr. Phillips agreed that the pain throughout Plaintiff's body is not emanating from Plaintiff's right thumb. Although Plaintiff complained of diffuse pain throughout her body and told Dr. Phillips she had 18 pain points throughout her shoulders, mid back, lower back, hips, elbows, and knees, Plaintiff did not complain of any pain to palpation anywhere on her body, which Dr. Phillips characterized as an inconsistency in Plaintiff's clinical *Page 17 
presentation. Dr. Phillips opinions are based on what Plaintiff told him about her pain and other symptoms. Although Dr. Duda had referred Plaintiff to Dr. Phillips for treatment of CRPS, Dr. Phillips opined that Plaintiff does not have CRPS.
47. Plaintiff hired Dr. Ann Neulicht, a licensed professional counselor with a doctorate degree in rehabilitation research and a life care planner, to render opinions as to Plaintiff's functional capacity and alleged need for additional medical treatment in November 2006. Dr. Neulicht is not a medical doctor or medical professional of any kind and agrees that she is not qualified to make medical diagnoses or prognoses or to give medical causation opinions.
48. Dr. Neulicht agreed that the premises from which her conclusions in this case have been drawn include what Plaintiff told her about Plaintiff's condition and circumstances, Plaintiff's medical records, and Dr. Neulicht's correspondence with Dr. Goli and Dr. Edwards. Dr. Neulicht further agreed that the more accurate the premises from which a conclusion is drawn, the more accurate the conclusion.
49. Dr. Neulicht produced a March 2, 2007 report to Plaintiff's lawyer. In preparing her report, the only physicians with whom Dr. Neulicht spoke were Dr. Goli and Dr. Edwards. Dr. Neulicht did not speak to Dr. Bartko in preparing her report. Dr. Neulicht's report includes more than a page in summary of Dr. Duda's records and opinions and only a single four-sentence paragraph in summary of Dr. Bartko's opinions. Dr. Neulicht has never seen any surveillance video of Plaintiff or read the Commission's November 19, 2003 Opinion Award, although she was aware of that Opinion Award.
50. Plaintiff told Dr. Neulicht in 2006 that she feels that she is functioning at an existence/survival mode. Plaintiff told Dr. Neulicht that, after spending 1 ½ hours on the *Page 18 
Disability Limitations Checklist Form, she had to stop and rest due to pain. Plaintiff further reported to Dr. Neulicht that, once pain starts, it moves everywhere. Plaintiff further told Dr. Neulicht that, she drives with her left hand on the steering wheel, that her maximum tolerance for shopping is thirty (30) minutes due to her pain, and that she routinely breaks things because her right hand has no sustained grip. Plaintiff further told Dr. Neulicht that she has to go to a jeweler to have her bracelets removed due to her alleged pain. Plaintiff's reports to Dr. Neulicht are contradicted by the 2008 surveillance video.
51. Dr. Neulicht's report includes the following paragraph:
 Ms. Inabnet describes periodic pain as throbbing, pounding, jumping, shooting, drilling, stabbing, lancinating [sic], sharp, cutting, lacerating, pinching, pressing, cramping, crushing, wrenching, searing, smarting, stinging, dull, sore, hurting, aching, heavy, tender, rasping, splitting, tiring, exhausting, sickening, suffocating, frightful, terrifying, vicious, killing, blinding, miserable, intense, unbearable, spreading, radiating, penetrating, piercing, tight, drawing, tearing, freezing, nauseating, agonizing, and torturing.
 On a McGill Pain Diagram, she indicates aching neck, mid-back, elbow and posterial calf pain as well as stabbing thoracic, low back, anterior shoulder, chest, right thumb, and bilateral leg pain. Stretching, biofeedback, exercises/meditation, acupuncture and rest/sleeping relieve her pain. Weather changes, barometric pressure/high pressure systems, and stress increase her pain. Pain on completion of the McGill form (one hour) was described as excruciating.
52. Plaintiff was being treated and medicated for depression prior to the November 21, 1999 incident that gives rise to this claim.
53. The Full Commission finds based upon the greater weight of the evidence that Plaintiff's complaints of pain and other symptoms, both physical and psychological, are not credible. *Page 19 
54. The greater weight of the evidence shows that Plaintiff has failed to prove a change of condition since the Full Commission's November 19, 2003 Opinion Award.
55. Plaintiff has not returned to work since the November 19, 2003 Full Commission Opinion Award. Plaintiff has a B.S. degree from UNC-Greensboro and was working for Defendant-Employer as a real estate broker as of the November 21, 1999 incident that gives rise to this claim. Prior to working for Defendant-Employer, Plaintiff had worked as a physician's office administrator and as a supervisor of conservation and agency administration, and as a customer service representative for an insurance company.
56. As provided for in the Full Commission's November 19, 2003 Opinion and Award, Defendants retained vocational rehabilitation specialist George Lentz, Sr., Ed.D., C.R.C., L.P.C., in February, 2004, to help Plaintiff return to gainful employment. Mr. Lentz's April 20, 2005 report includes a labor market survey listing five jobs that qualify as suitable employment based on Plaintiff's education, work history, experience, physical restrictions. Each of the jobs listed by Mr. Lentz is within Plaintiff's functional capacities as they were known to exist as of April 20, 2005, including the restrictions placed on Plaintiff by Dr. Steven Sanford on March 19, 2004. One of the job opportunities identified for Plaintiff by Mr. Lentz potentially paid $1,000 per week and another potentially paid $2,000 per month. Plaintiff did not follow up on any of the five opportunities identified by Mr. Lentz.
57. Plaintiff has not looked for work since November 21, 1999.
 ***********
Based on the foregoing Stipulations and Findings of Fact, the Full Commission makes the following: *Page 20 
 CONCLUSIONS OF LAW
1. Plaintiff has the burden of proving the change of condition that she alleges has occurred since the November 19, 2003 Opinion Award and that the new condition is causally-related to the injury that is the basis of that November 19, 2003 Opinion Award. N.C. Gen. Stat. § 97-47.
2. In order to carry her burden of proving the change of condition for purposes of N.C. Gen. Stat. § 97-47, Plaintiff must prove: (1) a substantial change in physical capacity to earn wages (2) occurring after the November 19, 2003 Opinion Award and (3) differing from the existing condition as of the November 19, 2003 Opinion Award. See Bailey v. SearsRoebuck Co., 131 N.C. App. 649, 508 S.E.2d 831 (1998). "A continued incapacity of the same kind and character and for the same injury is not a change of condition" for purposes of N.C. Gen. Stat. § 97-47; See Pratt v. Upholstery Co.,252 N.C. 716, 722, 115 S.E.2d 27, 33 (1960). Plaintiff has failed to prove a change of condition based upon the greater weight of the evidence.
3. In cases where, as here, the exact nature and probable genesis of a particular type of condition involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the condition. Holley v. ACTS,357 N.C. 228, 581 S.E.2d 750 (2003). However, when such expert testimony is based merely upon speculation and conjecture, it is not sufficiently reliable to qualify as competent evidence on issues of medical causation. Id. Without competent evidence of causation, Plaintiff has not proven a compensable change of condition.Blair v. American Television and Communications Corp.,124 N.C. App. 420, 477 S.E.2d 190 (1996). *Page 21 
4. Plaintiff is no longer entitled to any indemnity benefits in connection with this claim, because Plaintiff is not disabled within the meaning of the Workers' Compensation Act. Where an award has been made by the Commission, payable during disability, there is a presumption that disability lasts until the employee returns to work, and likewise a presumption that disability ends when the employee returns to work at wages equal to those she was receiving at the time of the injury that gives rise to her claim.Watkins v. Central Motor Lines,279 N.C. 132, 181 S.E.2d 588 (1971). Defendants have rebutted the presumption of Plaintiff's disability as created by the Full Commission's November 19, 2003 Opinion Award and have proven that Plaintiff is no longer disabled by the presentation of credible, competent evidence. Id.
5. Plaintiff reached maximum medical improvement for her right thumb as of March 19, 2004 and has not had any causally-related, compensable change of condition since the November 19, 2003 Opinion and Award. Plaintiff does not have any other causally-related condition impacting Plaintiff's ability to return to work at wages equal to those she was receiving at the time of the injury that gives rise to her claim. Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). The greater weight of the evidence shows that Plaintiff is capable of performing the job in which plaintiff was working at the time of her injury. The greater weight of the credible evidence shows that Plaintiff is no longer disabled. Id.
6. Plaintiff is not entitled to any benefits for permanent partial disability, as Plaintiff elected temporary total disability benefits instead and the value of any and all permanent partial disability ratings assigned to Plaintiff have been eclipsed by the amount of temporary total disability benefits paid to her since the assignment of all such ratings. Collins v. Speedway Motor Sports Corp.,165 N.C. App. 113, 598 S.E.2d 185 (2004). *Page 22 
7. The greater weight of the evidence shows that Plaintiff is not entitled to further medical compensation. N.C. Gen. Stat. §§ 97-25; 97-25.1.
 ***********
Based on the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission makes the following award:
 AWARD
1. Plaintiff's claims for additional disability benefits is DENIED. Plaintiff is not entitled to further disability benefits.
2. Plaintiff's claim for additional medical compensation is DENIED.
3. Each side shall pay its own costs.
This the 28th day of June 2010.
 S/___________________ STACI T. MEYER COMMISSIONER
CONCURRING:
 S/___________________ DIANNE C. SELLERS COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1